IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Walker D. Miller

Civil Action No.  08-cv-02528-WDM-BNB

JACK J. GRYNBERG*, et al.*,

     Plaintiffs,

v.

IVANHOE ENERGY, INC., *et al.*,

     Defendants.

---

**CORRECTED
ORDER ON VARIOUS MOTIONS**

---

Miller, J.

     This matter is before me on Defendants' Amended Motion to Dismiss for Lack of

Personal Jurisdiction (Docket No. 18); the parties' Joint Motion to Clarify Applicability of

Motion to Dismiss Operative Complaint (Docket No. 52); Plaintiffs' Motion for Partial

Summary Judgment on the General Personal Jurisdiction of Defendant Friedland

(Docket No. 83); Plaintiffs' Appeal of Magistrate Judge Ruling (Docket No. 87);

Defendants' Motion to Strike Plaintiffs' Motion for Partial Summary Judgment (Docket

No. 88); and Plaintiffs' Motion to Transfer (Docket No. 96).  I have considered the

motions, related briefs, and Complaint and conclude that neither oral argument nor an

evidentiary hearing is required.

Background[1]

This case surrounds the Pungarayacu Tar Sands Heavy Oil Deposit (the "Pungarayacu Field") in the Nation of Ecuador ("Ecuador").  According to Plaintiffs' Amended Complaint (Docket No. 40), Plaintiff Jack J. Grynberg ("Grynberg") and a partner formed the Ecuadorian company Cotundo Minerales S.A. ("Cotundo") in 2006.[2] In March, April, and May of 2006, Ecuador granted Cotundo seventeen exclusive mining concessions to the Pungarayacu Field, which gave Cotundo the exclusive right to exploration and production of approximately 195,757.8 acres in the Pungarayacu Field for thirty years.  After obtaining the licenses, Grynberg put together extensive technical data and analysis on the Pungarayacu Field including revised estimates of the amount of oil in the area.  Previous estimates were that approximately seven billion barrels of heavy oil could be extracted from the area.  By relying on an innovative process to extract the deposits (called "Ecumulsion" by Grynberg), however, Grynberg estimated fifteen billion barrels or more of recoverable hydrocarbons.

Grynberg then began seeking "the best heavy tar sand processing available." (Am. Compl., Docket No. 40 ¶ 22.)  During this process, Grynberg learned of Ivanhoe Energy, Inc. ("Ivanhoe"), a Canadian corporation that had "a potential process utilizing the recovery and upgrading of hydrocarbons from tar sands."  *Id.*  According

---

[1]  As this is a motion to dismiss and, therefore, all well-pled facts in the complaint must be accepted as true, this section is based on the Amended Complaint.

[2]  Grynberg is President of RSM Production Corporation ("RSM"), which, in turn, is the partial owner of Cotundo.  The other owner of Cotundo is the Panamanian corporation, Archidona Minerales, S.A.  Grynberg appears to be the only Plaintiff that is a resident of Colorado.

Defendants' Motion to Dismiss, Ivanhoe is a "independent, international heavy-oil development and production company focused on pursuing long-term growth in its reserves and production using advanced technologies." (Mtn. to Dismiss, Docket No. 18 at 7.)   Ivanhoe is a Canadian corporation with its principal offices in Vancouver, Canada.  The company is currently engaged in oil and gas projects in Canada, Asia, the Middle East, Latin American, and the United States in California and Texas.   Ivanhoe Energy Latin America, Inc. ("IELA") is a wholly owned subsidiary of Ivanhoe and has its principal office in Bakersfield, California.  Ivanhoe Energy Ecuador ("IEE") was formed as a wholly owned subsidiary of IELA in 2007 and has its principal office in Quito, Ecuador.  According to the Amended Complaint, Defendant David Martin ("Martin") is Executive Co-Chairman of Ivanhoe and Executive Chairman of IELA and IEE.  Martin is a resident of California.  Defendant Robert M. Friedland ("Friedland"), is the Executive Chairman and CEO of Ivanhoe.  Friedland resides in Singapore.

The Amended Complaint asserts that in August 2006, Grynberg contacted Martin at IELA's Bakersfield, California offices regarding the Pungarayacu Field.  During this conversation, Martin allegedly requested information from Grynberg regarding the Pungarayacu Field.  Grynberg emailed Martin information on Grynberg Petroleum and mailed Martin "a detailed proprietary and confidential report on the Pungarayacu Field, the Plaintiffs' government concessions and the project." (Am. Compl., Docket No. 40 ¶ 23.)  This report contained details about the Ecumulsion method and Grynberg's revised estimates of the deposits at Pungarayacu Field.  Subsequently, Martin informed Grynberg that Ivanhoe would be interested in entering into a joint venture with Cotundo with respect to the Pungarayacu Field.  During further phone conversations, of which

there were either one or two, the parties allegedly verbally agreed on twenty percent participation by Ivanhoe if the deal moved forward.  Grynberg then attempted to visit Ivanhoe's pilot plant operation in Bakersfield, California, but was given the "run-around" and, therefore, never visited Bakersfield.  Sensing that the deal would not move forward, Grynberg requested Martin return the confidential material to Grynberg.  It is unclear if Martin complied with this request.

In March 2008, Plaintiffs became aware that representatives from Ivanhoe and/or its subsidiaries were in Quito, Ecuador for discussions with Ecuadorian officials regarding the Pungarayacu Field.  Ecuadorian officials also made two trips to Bakersfield, California to visit Ivanhoe's pilot plant.  On April 18, 2008, Ecuador approved the Mining Constitutional Mandate which provided that "[a]ll mining concessions in the exploration phase and that have not made any investment in developing the project up to December 31st, 2007, or which have not presented the corresponding environmental impact study or that have not completed the previous consultation process, even those pending administrative resolution, are declared expired without economic compensation." (April 28, 2008 letter to Cotundo, Docket No. 40-7 at 2.)  It is unclear from the Amended Complaint whether Plaintiffs' concessions were eventually declared expired pursuant to this mandate[3], but it is clear that Ivanhoe

_____

[3]  The letter itself indicated that, at the time of the letter, the "Mining authorities [were] still uncertain as to how they [were] going to apply the Mandate" and that the Mining Authorities had not published the list of expired concessions.  (Letter dated April 18, 2008, Docket No. 40-7 at 3.)  However, in a sworn affidavit attached to Plaintiffs' response to the motion to dismiss, Grynberg states that Cotundo's concessions were cancelled in April 2008.  (*See* Grynberg Aff., Docket No. 38-2 ¶ 10.)  Notably, a sworn affidavit by Jim Ford, a consultant of Cotundo's, states that the concessions were confiscated by the Ecuadorian government in July 2008.  (*See* Ford Aff., Docket No. 77-

was subsequently awarded the concession to the Pungarayacu Field.  Indeed, on

October 8, 2008, Ivanhoe issued a press release announcing that IEE had "signed a

contract with Ecuador state oil companies Petraecuador and Petraproduccion to explore

and develop Ecuador's Pungarayacu heavy-oil field, utilizing Ivanhoe's HTL upgrading

technology."  (Press Release, Docket No. 40-9 at 2.)   On October 28, 2008, *Oil and*

*Gas Journal* reported the contract and also that Ivanhoe estimated that the

Pungarayacu Field had fifteen to twenty billion barrels of oil—an estimate that Plaintiffs

claim resulted solely from viewing their confidential materials.  Plaintiffs allege that the

only reason that Defendants were able to secure the contract for the Pungarayacu Field

was that they unlawfully paid cash and valuable gifts to President Raphael Correa

Delgado.  Plaintiffs now bring claims against Defendants for fraud, intentional and

tortious interference with prospective unique business advantages, unjust enrichment,

civil conspiracy to commit fraud, and Racketeer Influenced and Corrupt Organizations

("RICO") violations.

Discussion

1.    <u>Plaintiffs' Appeal of Magistrate Judge Ruling (Docket No. 87)</u>

On April 13, 2009, Plaintiffs filed an objection (Docket No. 87) to Magistrate

Judge Boland's ruling denying limited jurisdictional discovery.[4]  As the objection deals

---

4 ¶ 6.)

[4]Plaintiffs sought information regarding, *inter alia*, cases in which Friedland was a
party to litigation in Colorado, communications between Martin and Friedland
concerning "any business venture in Ecuador from 1996 to the present," identities of the
corporate Defendants' directors and dates of service, "copies of all balance sheets
produced by [the corporate Defendants]" from 1996 to the present, copies of inter-
corporate agreements between the corporate Defendants, copies of the corporate
Defendants' corporate minutes concerning business activity in Ecuador, financial

5

with claimed jurisdictional discovery, it is appropriate to address Plaintiffs' objection to

Magistrate Judge Boland's ruling prior to addressing the jurisdictional issues

themselves.  After a hearing on February 10, 2009, Magistrate Judge Boland stayed all

discovery in this case pending my resolution of the motions to dismiss based on

jurisdiction.  (*See* Docket No. 44.)  At that hearing Plaintiffs indicated that they did not

think that jurisdictional discovery was necessary, but reserved the right to request such

discovery after my ruling if that ruling should reveal a need for jurisdictional discovery.

(Feb. 10, 2009 Hearing Tr., Docket No. 57 at 11:5–13; 19:1–20:25.)  Subsequently,

however, on March 16, 2009, Plaintiffs moved to lift the stay to allow for "limited

jurisdictional discovery."  (Docket No. 70.)  Defendants opposed this action arguing that

the motion was untimely made and that the discovery sought was not tailored to impact

resolution of the jurisdictional issues.  After a hearing on the motion, Plaintiffs indicated

that although they had made the motion for limited jurisdictional discovery prior to my

ruling on jurisdiction, they still believed that it would be possible to proceed as decided

at the February 10, 2009 hearing, *i.e.*, to await a jurisdictional ruling from me prior to

requesting or engaging in any jurisdictional discovery.  (Apr. 3, 2009 Hearing Tr.,

Docket No. 93 at 6:20–7:15.)  Magistrate Judge Boland denied Plaintiffs motion (*see*

Docket No. 84) stating at the hearing that the motion came too late, the "requested

discovery appears to present a low probability of impacting the determination of the

jurisdictional issue . . . [, t]he discovery sought would impose an extreme burden on the

corporate defendants," and that the requests were largely irrelevant to the jurisdictional

---

records relating to "amounts spent entertaining Ecuadorian government officials," and
copies of employment agreements for Martin and Friedland. Ex. 1 to Plaintiffs'
Objections to Ruling of Mag. J. (Docket No. 87-2).

issues.  (Apr. 3, 2009 Hearing Tr., Docket No. 93 at 22:10–23:11.)

Plaintiffs now appeal this ruling arguing that Magistrate Judge Boland "abused his discretion and made two clearly erroneous rulings."  (Docket No. 87 ¶ 1.) Specifically, Plaintiffs contend that Magistrate Judge Boland was incorrect in denying their request to lift the stay when "to do so prejudiced Plaintiffs' ability to prove their case, but did not prejudice Defendants" and in refusing "to allow Plaintiffs' limited discovery regarding relevant issues of general and specific jurisdiction." *Id.* Defendants respond that Magistrate Judge Boland committed no error and, in fact, acted pursuant to Tenth Circuit authority with respect to jurisdictional discovery.

With respect to non-dispositive matters, the Federal Rules of Civil Procedure provide that I may "modify or set aside any part of the [magistrate judge's] order that is clearly erroneous or contrary to law."  Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1) (providing that a district court may reconsider any pretrial matter if the magistrate judge's order is "clearly erroneous or contrary to law.").  "The clearly erroneous standard . . . requires that the reviewing court affirm unless it 'on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  *See Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1464 (10th Cir. 1988) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

In the Tenth Circuit, "[w]hen a defendant moves to dismiss for lack of jurisdiction, either party should be allowed discovery on the factual issues raised by that motion." *Budde v. Ling-Temco-Vought, Inc.*, 511 F.2d 1033, 1035 (10th Cir. 1975).  In determining whether to allow jurisdictional discovery however, the trial court "is vested with broad discretion and should not be reversed unless discretion is abused."  *Id.* "[A]

7

refusal to grant discovery constitutes an abuse of discretion if the denial results in prejudice to a litigant." *Sizova v. Nat'l Inst. of Stds. & Tech.*, 282 F.3d 1320, 1326 (10th Cir. 2002) (citations omitted) (concluding that further factual development may assist a plaintiff in arguing for the tolling of an Equal Employment Opportunity time limit when the issue was decided by the district court after conducting a *sua sponte* evidentiary hearing without notice to the parties and without allowing discovery related to the issues addressed at the evidentiary hearing).   "Prejudice is present where 'pertinent facts bearing on the question of jurisdiction are controverted . . . or where a more satisfactory showing of the facts is necessary.'" *Id.* (quoting *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977)).

In this case, despite Plaintiffs' assertions that Magistrate Judge Boland was incorrect in his ruling, there is no evidence that Magistrate Judge Boland's order was "clearly erroneous or contrary to law," Fed. R. Civ. P. 72(a), and I am not left with the "definite and firm conviction that a mistake" was committed, *Ocelot Oil*, 847 F.2d at 1464 (citing *U.S. Gypsum*, 333 U.S. at 395).   Magistrate Judge Boland was within his discretionary authority in denying Plaintiffs' motion.   *See Budde*, 511 F.2d at 1035).   In particular, I note that Plaintiffs admitted at the hearing that foregoing jurisdictional discovery until after I ruled on jurisdiction was an acceptable procedure to follow. Although Plaintiffs reserved the right to move for discovery, it was reasonable for Magistrate Judge Boland to rely on Plaintiffs' statements at the hearing and doing so was not clearly erroneous.   Furthermore, I agree with Magistrate Judge Boland that the proposed discovery covers issues that are largely irrelevant to the jurisdictional issues now before the court.   Therefore, the discovery is unlikely to have a real impact on the

8

resolution of these issues.  *See Bell Helicopter Textron, Inc. v. Heliqwest Int'l, Ltd.*, 385

F.3d 1291, 1298–99 (10th Cir. 2004) (concluding that, "[g]iven the very low probability

that the lack of discovery affected the outcome" of the case, the district court did not

abuse its discretion in denying jurisdictional discovery).  Plaintiffs' arguments to the

contrary are unpersuasive.  For example, there is no valid jurisdictional basis for

Plaintiffs to request all balance sheets for the corporate Defendants from 1996,

corporate minutes of all business activities in Ecuador from 1996, or the detail of "each

and every communication between" Martin and Friedland.  Although these requests

may provide valuable information regarding the case at large, I conclude that, they are

not tailored to address the limited question of personal jurisdiction over Defendants.

Therefore, as Magistrate Judge Boland provided clear and valid reasons for denying

Plaintiffs' motion for jurisdictional discovery, Plaintiffs' objections shall be denied and I

will rule on the jurisdictional issues on the briefs before me.

2.     Defendants' Motion to Dismiss (Docket No. 18)

As a preliminary matter, I must address the parties' Joint Motion to Clarify

Applicability of Motion to Dismiss Operative Complaint (Docket No. 52).  This motion

requests that I view Defendants' Motion to Dismiss as applying to whichever

complaint—the Original Complaint (Docket No. 1) or the First Amended Complaint

(Docket No. 40)—is deemed the operative complaint.  In this case, it remains somewhat

unclear which complaint is the operative complaint as the First Amended Complaint was

filed after Correa filed a responsive pleading but without leave of court as is required by

Fed. R. Civ. P. 15(a)(2), but also after Plaintiffs had moved to dismiss Correa from the

lawsuit.  In any case, as I have since dismissed Correa without prejudice from this case

9

(*see* Docket No. 112) and the First Amended Complaint primarily removes the allegations concerning Correa, I conclude that "justice so requires" that the amended pleading be allowed.  Therefore, the parties' joint motion shall be granted.  The First Amended Complaint (Docket No. 40) is accepted as filed and is the current operative complaint.  Moreover, I will address Defendants' Motion to Dismiss as applied to the First Amended Complaint.

In their motion to dismiss, Defendants argue that this Court does not have personal jurisdiction over them because the torts allegedly committed have no nexus to Colorado, *see Wenz v. Memery Crystal*, 55 F.3d 1503, 1507–08 (10th Cir. 1995) ("'Hence, when both the tortious conduct and the injury occur in another state, the fact that plaintiff resides in Colorado and experiences some economic consequences here is insufficient to confer jurisdiction on a Colorado court.'" (quoting *Amax Potash Corp. v. Trans-Resources, Inc.*, 817 P.2d 598, 600 (Colo. Ct. App. 1991))), and the Defendants do not have sufficient minimum contacts with Colorado, the forum state, to satisfy constitutional requirements, *see Int'l Shoe v. Washington*, 326 U.S. 310, 316 (1945) ("[D]ue process requires . . . [a defendant] have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" (quoting *Milliken v. Meyer*, 311 U.S. 427, 463 (1940))).  Plaintiffs disagree and set forth a variety of theories under which this Court has personal jurisdiction over Defendants.

It is Plaintiffs' burden to demonstrate jurisdiction over each Defendant.  *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998) (citing *Rambo v. Am. Southern Ins. Co.*, 839 F.2d 1415, 1417 (10th Cir. 1988)).  When the

district court does not hold an evidentiary hearing before ruling on jurisdiction, "the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion" to dismiss.  *Id.* (citing *Kuenzle v. HTM Sport-Und Freizeitgeräte AG*, 102 F.3d 453, 456 (10th Cir. 1996)).  In making this showing, "'[t]he allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits.'"  *Wenz*, 55 F.3d at 1505 (quoting *Doe v. Nat'l Med. Servs.*, 974 F.2d 143, 145 (10th Cir. 1992)); *accord Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063, 1070 (10th Cir. 2008) (stating that on *de novo* review, the Tenth Circuit must "tak[e] as true all well-pled (that is, plausible, non-conclusory, and non-speculative . . . ) facts alleged in plaintiffs' complaint.").  The plaintiff may buttress these allegations by alleging facts, in affidavit or other written form, that, if true, would support a finding of jurisdiction.  *OMI Holdings*, 149 F.3d at 1091.  "If the parties present conflicting affidavits, all factual disputes must be resolved in the plaintiff's favor, and 'the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party.'"  *Wenz*, 55 F.3d at 1505; *accord Dudnikov*, 514 F.3d at 1070 ("[A]ny factual disputes in the parties' affidavits must be resolved in plaintiffs' favor." (citing *FDIC v. Oaklawn Apartments*, 959 F.2d 170, 174 (10th Cir. 1992)).  To defeat plaintiffs' prima facie showing, a defendant must "present a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.'" *OMI Holdings*, 149 F.3d at 1091 (quoting *Burger King Corp. v. Rudzewica*, 471 U.S. 462, 477 (1984)).

Personal jurisdiction requires the plaintiff to show that jurisdiction is proper "under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment."  *Benton v. Cameco Corp.*, 375 F.3d

1070, 1075 (10th Cir. 2004) (internal quotations omitted) (quoting *Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1295 (10th Cir. 1999)).  "'Colorado's long arm statute is coextensive with constitutional limitations imposed by the due process clause.  Therefore, if jurisdiction is consistent with the due process clause, Colorado's long arm statute authorizes jurisdiction over a nonresident defendant.'"  *Id.* (quoting *Day v. Snowmass Stables, Inc.*, 810 F.Supp. 289, 291 (D. Colo. 1993) (citation omitted)).  Under the due process clause, a "personal jurisdiction analysis involves a two-step inquiry."  *AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1057 (10th Cir. 2008).  First, I must "ask whether the nonresident defendant has 'minimum contacts' with the forum state such 'that he should reasonably anticipate being haled into court there.'"  *Id.* (quoting *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).  Second, if the defendant has sufficient minimum contacts with the forum state, I "must then consider whether the exercise of personal jurisdiction over the defendant offends 'traditional notions of fair play and substantial justice.'"  *OMI Holdings*, 149 F.3d at 1091 (quoting *Asahi Metal Indus Co. v. Superior Court of Cal.*, 480 U.S. 102, 109 (1987)).

     a.    *Minimum Contacts*

     As discussed above, "due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Benton*, 375 F.3d at 1075 (quoting *Milliken*, 311 U.S. at 463).  The "minimum contacts" standard may be met by showing either general jurisdiction, *i.e.*, contacts with the state so strong that

jurisdiction is proper for any claim, or specific jurisdiction, *i.e.*, contacts with the state relating to the specific claim at issue.  *See OMI Holdings*, 149 F.3d at 1090–91. Plaintiffs assert that there is general personal jurisdiction over Friedland and specific jurisdiction over all Defendants arising out of the transactions at issue here.

    i.    General Jurisdiction

A court may assert general jurisdiction over a defendant for any claim, whether arising from activities in the state or not, "based on the defendant's general business contacts with the forum state."  *OMI Holdings*, 149 F.3d at 1091 (citing *Helicopteros Nacionales de Columbia v. Hall*, 466 U.S. 408, 415 (1984)).  "However, '[b]ecause general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's continuous and systematic general business contacts.'"  *Id.* (quoting *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996)).  In determining whether a defendant's contact with a forum state are "continuous and systematic", courts have considered:

> (1) whether the corporation solicits business in the state through a local office or agents; (2) whether the corporation sends agents into the state on a regular basis to solicit business; (3) the extent to which the corporation holds itself out as doing business in the forum state, through advertisements, listings or bank accounts; and (4) the volume of business conducted in the state by the corporation.

*Kuenzle*, 102 F.3d at 457 (citing *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1533 (10th Cir. 1996)).

In this case, Plaintiffs only allege that this Court has general jurisdiction over Defendant Friedland because he has been a litigant in the Colorado courts numerous

times in the past in relation to the clean up for the Summitville Mine Site.  Friedland was previously the director and president of Summitville Consolidated Mining Company, Inc. ("SCMCI"), which operated a large gold mine in the Summitville Mining District near Del Norte, Colorado (the "Mine") from 1984 to 1992.  *See Friedland v. TIC - The Indus. Co.*, 566 F.3d 1203, 1204 (10th Cir. 2004) (affirming district court summary judgment for defendants in Friedland's contribution action relating to the Mine).  SCMCI declared bankruptcy in 1992 and the United States Environmental Agency took over management of the site.  *Id.*  After an investigation of "potentially responsible parties," the United States and the State of Colorado sued Friedland for the clean up costs related to the Mine ("Mine Litigation") under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.  Id.* In the course of the litigation, Friedland filed counterclaims against both the United States and the State of Colorado.  (*See* February 18, 2000 News Article on the Colorado Attorney General's website, Docket No. 38-5.)  Additionally, Friedland filed third party claims against twelve other "potentially responsible parties."  *Id.*  In December 2002, Friedland settled the claims brought against him, agreeing to pay approximately twenty million for clean up costs.  *Friedland*, 566 F.3d at 1204.  Friedland has filed three actions to recover the settlement amount and his litigation costs: (1) a 1999 lawsuit in Montana state court against Industrial Contractors Corp. and United States Fidelity & Guaranty Company, which was settled for confidential amounts by 2002; (2) a 2002 action in Colorado state court against The Travelers Indemnity Company, which settled for a confidential amount in 2005; and (3) a 2004 action against The Industrial Company and GeoSyntec, which was dismissed on summary judgment.

14

*Id.* at 1204–05, 1211.

Although Friedland has been involved in three other lawsuits in Colorado,[5] two of

which were initiated by him, I agree with Defendants there is no legal authority

supporting the notion that this should be sufficient to sustain general jurisdiction over

Friedland.  Rather, almost all the cited case law indicates that the pursuit of the litigation

in Colorado does not constitute "continuous and systematic general business contacts"

with Colorado.  *OMI Holdings*, 149 F.3d at 1091 (quoting *Metropolitan Life Ins.*, 84 F.3d

at 567).  Indeed, although involving three separate cases, Friedland's litigation in

Colorado all surrounded a single issue, *i.e.*, the clean up costs for the Mine.  *See*

*Friedland*, 566 F.3d at 1204–05.  Plaintiffs have cited no persuasive authority upon

which I could determine that unrelated litigation related to a single separate issue is

sufficient to confer general jurisdiction on a defendant for any and all future lawsuits in a

forum state; in fact, case law generally demonstrates the reverse.  *See Jones v. Blige*,

2006 WL 1329247, at *5 (E.D. Mich. May 16, 2006) (unpublished) (holding that general

jurisdiction was not established by the defendant's status as a plaintiff in three unrelated

lawsuits); *Merlino v. Harrah's Entm't, Inc.*, 2006 WL 401847, at * 3 (E.D. Penn. Feb. 17,

2006) (unpublished) ("Filing even nineteen lawsuits, without more, cannot constitute

continuous and systematic activity so as to establish general jurisdiction."); *Travelers*

*Cas. & Sur. Co. v. Interclaim (Bermuda) Ltd.*, 304 F.Supp.2d 1018, 1025 (N.D. Ill. 2004)

(holding that litigation "limited to-at most-a [sic] nine month period" did not "warrant a

finding of general jurisdiction sufficient to require [defendants] to come to [the forum

---

[5]  Notably, Plaintiffs do not assert that Friedland is subject to general jurisdiction in Colorado based on his involvement with the Mine, rather they assert only that he is subject to general jurisdiction for the subsequent Mine Litigation and recovery actions.

state] to answer '*any* litigation arising out of *any* transaction or occurrence taking place *anywhere* in the world'").[6]

I do note that Friedland's previous litigation in the state undermines some of the policy grounds for the doctrine of personal jurisdiction.  *See, e.g., Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) ("The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" (quoting *Int'l Shoe*, 326 U.S. at 319)); *World-Wide Volkswagon*, 444 U.S. at 292 ("The concept of minimum contacts . . . protects the defendant against the burdens of litigating in a distant or inconvenient forum.  And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.").  Since Friedland has availed himself of the use of the courts here, it can hardly be said that he needs protection from the burdens of litigating in an inconvenient forum.

Nonetheless, as discussed further below, even if there were a weak case for finding that jurisdiction exists here, I would nonetheless decline to exercise it over Mr. Friedland.  The second prong of the personal jurisdiction test, that the exercise of jurisdiction comport with traditional notions of fair play and substantial justice, is not satisfied here.

---

[6] Furthermore, none of the factors traditionally used to determine "continuous and systematic" contacts support a finding of general jurisdiction in this case.  *See Kuenzle*, 102 F.3d at 457 (citing *Trierweiler*, 90 F.3d at 1533).  Plaintiffs have set forth no evidence that Friedland solicits business in the state, that he sends agents into the state on a regular basis to solicit business, that he has bank accounts in Colorado, or that he has done any significant volume of business in this state.  *Id.*

ii.     Specific Jurisdiction

Alternatively, even if a defendant does not have "continuous and systematic" contacts with the forum state, a court may assert specific jurisdiction over a defendant when the litigation relates to the defendant's contacts with the forum state.  *See Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1066 (10th Cir. 2007) (citing *Burger King*, 471 U.S. at 472–73).  To determine if a party is subject to specific jurisdiction, I must decide whether the person has "such minimum contacts with the forum state 'that he should reasonably anticipate being haled into court there.'" *OMI Holdings*, 149 F.3d at 1090 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1979)).

(1)     Colorado Long Arm Statute: Tortious Conduct

"Frequently, the commission of a tort, in itself, creates a sufficient nexus between the defendant and the state so as to satisfy the due process inquiry." *D & D Fuller CATV Constr., Inc.*, *v. Pace*, 780 P.2d 520, 525 (Colo. 1989).  In such cases, the establishment of the tortious conduct is sufficient to satisfy the minimum contacts analysis "because the defendant is so connected with the forum state that traditional notions of fair play and substantial justice are not offended by the state's exercise of jurisdiction" and "a defendant can reasonably foresee being haled into court to answer for his tortious conduct." *Id.* (citations omitted).  There are instances, however, when the tortious conduct is "so remote as to require a closer nexus between the defendant and that state" and the "court must engage in a complete minimum contacts analysis." *Id.* (citations omitted).

"Under the Colorado long arm statute, a person is subject to the jurisdiction of the courts of Colorado, 'concerning any cause of action arising from [t]he commission of

17

a tortious act within [the] state.'" *AST Sports*, 514 F.3d at 1060 (quoting Colo. Rev.

Stat. § 13-1-124)).  Generally, the tortious conduct involves a two-step process.  *Id.*

First, I must determine whether the "'complaint alleges the commission of a tortious act

within the state.'" *Id.* (quoting *Classic Auto Sales, Inc. v. Schocket*, 832 P.2d 233, 235

(Colo. 1992)).  Second, I must "'undertake a particularized inquiry as to the extent of

which the defendant has purposefully availed itself of the benefits of the forum's laws.'"

*Id.* (quoting *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1199–1200 (Colo.

2005)).  "Tortious act 'implies the total act embodying both cause and effect.'" *Id.*

(quoting *Classic Auto Sales*, 832 P.2d at 235).  Indeed, the tortious conduct prong of the

Colorado long-arm statute may be satisfied "when (1) tortious conduct occurs in

Colorado, or (2) when tortious conduct initiated in another state causes injury in

Colorado."  *Wenz*, 55 F.3d at 1507 (citing *Classic Auto Sales*, 832 P.2d at 235–36);

*accord AST Sports*, 514 F.3d at 1061 (noting that it is sufficient for purposes of

Colorado's long arm statute "'when only the resulting injury occurs'" in Colorado

(quoting *Classic Auto Sales*, 832 P.2d at 233)).  However, "[n]ot all alleged 'injuries that

result from tortious conduct in a foreign state will trigger long-arm jurisdiction."  *Wenz*,

55 F.3d at 1507–08.  "'[W]hen both the tortious conduct and the injury occur in another

state, the fact that plaintiff resides in Colorado and experiences some economic

consequences here is insufficient to confer jurisdiction on a Colorado court.'" *Id.* at

1508.  Rather, the "injury in Colorado 'must be direct, not consequential and remote'",

*id.* (quoting *Amax Potash Corp. v. Trans-Resources, Inc.*, 817 P.2d 598, 600 (Colo. Ct.

App. 1991)), and must be the proximate result of the tortious conduct, *id.* (citing *Texair*

*Flyers, Inc. v. District Court*, 506 P.2d 367, 370 (1973)).  With respect to business torts,

"the mere allegation that an out-of-state defendant has tortiously interfered with contractual rights or has committed other business torts that have allegedly injured a forum resident does not necessarily establish that the defendant possesses the constitutionally required minimum contacts." *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1079 (10th Cir. 1995); *Archangel*, 123 P.3d at 1199–2000 (quoting with approval *Far West*, 46 F.3d at 1079).

In this case, Plaintiffs maintain that the alleged conspiracy between the Defendants to deprive Plaintiffs of their concessions to the Pungarayacu Field constitute tortious conduct resulting in injury in Colorado such that specific jurisdiction is proper. Defendants disagree arguing that both the action resulting in injury and the injury itself occur outside of Colorado. I agree with Defendants. Plaintiffs allege no injury beyond mere incidental economic injury from the loss of their rights in another country, an injury that is insufficient to satisfy the minimum contacts prong. *See Wenz*, 55 F.3d at 1508. Nevertheless, Plaintiffs argue that this case is analogous to *AST Sports* where the Tenth Circuit concluded that the defendant's non-payment for orders placed with the plaintiff in Colorado caused injury to the plaintiff in Colorado sufficient to satisfy Colorado's long arm statute even though the fraud in the inducement was committed entirely in England. 514 F.3d at 1061. Although Plaintiffs are correct that the minimum contacts prong is satisfied "'when only the resulting injury occurs'" in the forum state, *AST Sports*, 514 F.3d at 1061 (quoting *Classic Auto Sales*, 832 P.2d at 233), in this case, the injury suffered by Plaintiffs was located in Ecuador, with only attendant economic consequences occurring in Colorado due solely to Plaintiffs' domicile in Colorado. *See Amax Potash,* 817 P.2d at 600 (complaint alleged that defendant had

19

tortiously induced third party to breach agreement with Colorado plaintiff to lease a potash mine in New Mexico; Colorado long arm statute was not satisfied because "plaintiff's alleged injury, namely the loss of anticipated profits from the operation of the New Mexico mine, was indirect and remote and resulted in derivative economic injury to plaintiff in Colorado only because of the fortuitous circumstance that plaintiff maintained its headquarters here."). *AST Sports* is distinguishable because in that case the *entire* and direct injury, *i.e.* the non-payment for orders fulfilled by the plaintiff, occurred in Colorado, while in this case, the injury suffered, as admitted by Plaintiffs, is the loss of Ecuadorian concessions to the Pungarayacu Field, with mere indirect economic injury occurring in Colorado. Therefore, I do not find *AST Sports* controlling or persuasive in this case. Instead, I find that the Tenth Circuit's decision in *Far West*, 46 F.3d at 1079–80, and the Colorado Supreme Court's decision in *Archangel*, 123 P.3d at 1199–1200, provide far better guidance.

In *Far West*, the Tenth Circuit determined that there was not sufficient minimum contacts with the forum state when there was "no evidence that defendants' alleged torts had any connection to [the forum state] beyond plaintiff's corporate domicile." 46 F.3d at 1080. In so holding, the Tenth Circuit examined "'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" *Id.* (quoting *Burger King*, 471 U.S. at 479). *Far West* further explained that the defendant's actions were not "expressly aimed at" the forum state, nor was the forum state the "focal point" of the relationship between the parties, *id.* (distinguishing *Calder v. Jones*, 465 U.S. 783, 789 (1983)), but rather the forum state had nothing more than "a fortuitous role in the parties' past dealing or would have any

20

role in their continuing relationship", *id.* Similarly, and in fact relying on *Far West*, the Colorado Supreme Court concluded in *Archangel* that the tortious conduct analysis required "an inquiry 'as to the extent to which the defendant has purposefully availed itself of the benefits' of Colorado's laws." 123 P.3d at 1200 (quoting *Far West*, 46 F.3d at 1079). Under that inquiry, the Colorado Supreme Court concluded that it lacked personal jurisdiction over the defendant foreign corporations who had entered into contracts with a Colorado corporation for exploration and exploitation of a Russian diamond deposit. *See id.* at 1190–91, 1200.

Taking Plaintiffs' allegations as true, the circumstances in this case are analogous to those in both *Far West* and *Archangel* as the Defendants, foreign corporations and individuals not residing in Colorado, interacted with Plaintiffs, who are domiciled in Colorado, regarding the concessions to a heavy oil deposit located in Ecuador.[7] Indeed, the Defendants' tortious actions were not aimed at Colorado and Colorado was not the focal point of the conspiracy or the parties' initial negotiations. *See Far West*, 46 F.3d at 1080. Furthermore, Colorado was not a factor in or a part of the parties' past relationship or prior negotiations nor was it contemplated to have any role in the parties' future relationship should the joint venture have moved forward. *See id.* Therefore, I conclude, just as in *Archangel*, that because Defendants did not avail themselves of the benefits of Colorado's laws, this Court lacks personal jurisdiction over

---

[7] I do note, however, that unlike *Far West* and *Archangel*, the parties in this case never entered into a formal agreement with respect to the Pungarayacu Field. Rather, Plaintiffs allege that Defendants conspired to deprive Plaintiffs of their rights in the Pungarayacu Field. Nevertheless, the analogy is still valid and I conclude that Defendants' alleged tortious conduct is insufficient to warrant an exercise of personal jurisdiction by this Court.

Defendants based on their tortious conduct.  123 P.3d at 1200.

(2)     Constitutional Issue: Purposeful Availment

The standard minimum contact analysis for specific jurisdiction requires me to determine "whether the defendant purposefully directed its activities at residents of the forum."  *Id.*  (citing *Burger King*, 471 U.S. at 472.  Additionally, it requires a determination of whether the action "arise[s] out of or relate[s] to," *id.* (citing *Burger King*, 471 U.S. at 472), the defendant's own activities "that create a substantial connection with the forum state," *id.* (citing *Asahi Metal Industry Co. v. Superior Court of Cal.*, 480 U.S. 102, 109 (1987)).  A contract between a nonresident and a resident is, alone, insufficient to establish sufficient minimum contacts with the forum state.  *Benton*, 375 F.3d at 1077 (citing *Burger King*, 471 U.S. at 473).  But, when a nonresident defendant "create[s] continuing relationships and obligations" with a resident of the forum state, the defendant becomes "subject to regulation and sanctions in the [forum state] for the consequences of their activities."  *Id.* (quoting *Burger King*, 471 U.S. at 473) (internal quotations omitted).  When parties from different states have entered into a contract, the relevant factors for determining minimum contacts "include 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'"  *Id.* (quoting *Burger King*, 471 U.S. at 473).

In this case, Plaintiffs allege that Martin, individually and/or as an agent for the corporate Defendants, had contacts with Grynberg that are sufficient to satisfy the minimum contacts prong.  Taking the allegations of the complaint as true and construing all discrepancies between the affidavits in Plaintiffs' favor, Martin had contact with

22

Grynberg on the following occasions: (1) Grynberg contacted Martin in August 2006 at Ivanhoe's Bakersfield, California offices, at which time Martin requested information regarding the Pungarayacu Field; (2) Grynberg sent Martin two emails on August 18, 2006 containing information on Grynberg Petroleum and Pungarayacu Field; (3) Grynberg mailed Martin his technical analysis of the Pungarayacu Field; (4)  Martin sent Grynberg information on Ivanhoe's technology in August 2006; and (5) Grynberg spoke to Martin on the phone on at least one, if not two, other occasions during which time they came to a tentative deal for the relative percentages for any deal between the two companies.

After considering Plaintiffs' allegations surrounding Martin's contacts with Colorado, I conclude that they are insufficient to establish the requisite minimum contacts to subject Martin to the jurisdiction of this Court.  First, I note that "[a] contract between a nonresident and a resident is, alone, insufficient to establish sufficient minimum contacts." *Benton*, 375 F.3d at 1077 (citing *Burger King*, 471 U.S. at 473). Therefore, as it is undisputed that the parties' relationship never even progressed to the point of entering into a formal agreement, the parties' alleged tentative agreement with respect to the relative participation by the companies in any future deal, is insufficient to establish minimum contacts. *See id.*

Second, I conclude that Martin's interactions with Grynberg are insufficient to "create continuing relationships and obligations" with respect to Colorado or residents thereof.  *See id.* (quoting *Burger King*, 471 U.S. at 473) (internal quotations omitted). Even assuming all of Plaintiffs' allegations are true, the only action that Martin affirmatively took towards Colorado or Grynberg was that he mailed Grynberg some

23

material regarding a technology used in tar sand deposit extraction.[8]   Indeed, most of the other contacts that Martin had with Grynberg were undisputedly the result of Grynberg reaching out to Martin in initiating the first contact, emailing materials to Martin, and sending Martin the confidential report on the Pungarayacu Field.   These contacts with Grynberg cannot serve to subject Martin to jurisdiction in Colorado because they do not constitute Martin's purposeful direction of his own activities towards Colorado or its residents.   *See Burger King*, 471 U.S. at 475 (holding that "the 'unilateral activity of another party or a third person'" is insufficient to subject a party to jurisdiction and that "[j]urisdiction is proper . . . where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State" (emphasis in original)).

Even if the one or two other phone calls were initiated by Martin, which is unclear, "[i]t is well-established that phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts."   *Far West*, 46 F.3d at 1077 (citations omitted); *accord  Melea*, 511 F.3d at 1068 n.7 ("[C]orrespondence with someone within the forum is typically insufficient to establish the requisite 'minimum contacts.'" (citing *id.*)).   To determine if a party's contacts with a resident of the forum state are sufficient, a court must look consider the "quality of th[e] contacts."   *See Melea*, 511 F.3d at 1068 n.7 (concluding that although the "large volume of communications . . . may be entitled

---

[8]   I note that it is unclear who initiated the other one or two phone calls between Grynberg and Martin as Martin does not recall these phone calls (*see* Martin Aff., Docket No. 18-2 ¶ 14) and neither the allegations in the Complaint (*see* Am. Compl., Docket No. 40 ¶¶ 23, 25, 26, 29, 30, 31) nor Grynberg's Affidavit states who initiated these phone calls and, in fact, Grynberg does not even recall whether there were one or two other phone calls (*see* Grynberg Aff., Docket No. 38-2 ¶ 19).   These contacts are addressed *infra*.

24

to some consideration, the quality of those contacts must also be taken into consideration").  In this case, even if Martin is considered to have purposefully directed himself towards Colorado by the phone calls and the mailing of the letter, the limited number of contacts between Martin and Grynberg and the failure of the parties to establish an ongoing business relationship weighs against a finding of minimum contacts.  Furthermore, with respect to the material allegedly mailed by Martin to Grynberg, I agree with Defendants that it does not appear to be related to this lawsuit. The material is an Executive Summary for a company called NEWCO, Inc. regarding its Hydrocarbon Recovery Technology, an extraction process "to recover unconventional oil, with virtually no environmental risks." (*See* Docket No. 40-5.)   It is unclear who NEWCO, Inc. is or how Plaintiffs allege they are related to Defendants or the facts of this case.  Therefore, I conclude that Martin's interactions with Grynberg are insufficient to establish the requisite minimum contacts with Colorado such that he is subject to this Court's jurisdiction.

      b.    *Fair Play and Substantial Justice*

If the first prong of the analysis has been satisfied, *i.e.*, a defendant has sufficient minimum contacts with the forum state, I must determine whether the second prong of the analysis supports an exercise of personal jurisdiction over the defendant.  *OMI Holdings*, 149 F.3d at 1091 (quoting *Asahi*, 480 U.S. at 109).  This second prong of the analysis asks "whether the exercise of personal jurisdiction over the defendant offends 'traditional notions of fair play and substantial justice.'"  *Id.* (quoting *Asahi*, 480 U.S. at 113).  This inquiry "requires a determination of whether a district court's exercise of personal jurisdiction over a defendant with minimum contacts is 'reasonable' in light of

the circumstances surrounding the case." *Id.* (citing *Asahi Metal*, 480 U.S. at 113).  In

making this determination, courts consider:

> (1) the burden on the defendant, (2) the forum state's interest in resolving the
> dispute, (3) the plaintiff's interest in receiving convenient and effective relief,
> (4) the interstate judicial system's interest in obtaining the most efficient
> resolution of controversies, and (5) the shared interest of the several states
> in furthering fundamental substantive social policies.

*Id.* at 1095 (citing *Asahi*, 480 U.S. at 113).  I am also mindful that in the jurisdictional

analysis, there is an interplay between the two prongs such that the stronger one prong

is the less strong the other prong must be to assert personal jurisdiction over the

defendant.  *Id.* at 1092 (citing *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 210

(1st Cir. 1994)).

As discussed above, I have determined that Martin and the corporate Defendants

do not have sufficient minimum contacts to satisfy the first prong of the personal

jurisdiction analysis, or even to fall within the reach of the Colorado long-arm statute.

As to Friedland, even if his previous contacts with the state were sufficient to establish

general personal jurisdiction, I conclude that the exercise of personal jurisdiction over

him would offend traditional notions of fair play and substantial justice.

i.      Burden on Defendants of litigating in Colorado

Although this factor is not dispositive, it is of "special significance, because it

serves to prevent the filing of vexatious claims in a distant forum where the burden of

appearing is onerous."  *OMI Holdings*, 149 F.3d at 1096 (citing *World-Wide

Volkswagen*, 444 U.S. at 292).   "When the defendant is from another country, this

concern is heightened and 'great care and reserve should be exercised' before exerting

personal jurisdiction over the defendant."  *Id.* (quoting *Asahi*, 480 U.S. at 114).   In this

case, the burden on Friedland, as well as the other Defendants, is significant; therefore,

the factor weighs against asserting jurisdiction.  Defendants have no office or property

located in Colorado, are not licensed to do business in Colorado, and employ no one in

Colorado.  Indeed, their only connection to Colorado appears to be the very limited

interactions that they had with Grynberg.  I also note that at least three of the

Defendants are from another country—Ivanhoe is a Canadian company with its principal

place of business in Canada, IEE is a Canadian corporation with its principal place of

business in Quito, Ecuador, and Friedland, although a U.S. citizen resides outside the

United States[9]—which also causes this factor to weigh against exerting jurisdiction.

      ii.     Forum state's interest in adjudicating the dispute

"States have an important interest in providing a forum in which their residents

can seek redress for injuries caused by out-of-state actors."  *OMI Holdings*, 149 F.3d at

1096 (citing *Burger King*, 471 U.S. at 483).  This interest is also "implicated where

resolution of the dispute requires a general application of the forum state's law."  *Id.*

(citing *Asahi*, 480 U.S. at 115).  Here, this factor may weigh slightly in favor of asserting

jurisdiction, but there are two factors to closely consider.  First, I note that it remains

unclear which state's laws are applicable to this case as there is not a clear state with

the most significant relationship to the claims.  *See AE, Inc. v. Goodyear Tire & Rubber*

*Co.*, 168 P.3d 507, 509 (Colo. 2007) ("'Colorado will adopt the general rule of applying

the law of the state with the most significant relationship with the occurrence and the

parties, as presented and defined in the Restatement, (Second) Conflict of Laws, Vol. 1,

---

[9]It is unclear where Friedland resided when his previous litigation was underway. It may be that he was in closer proximity to Colorado then than he is now.

Sec. 145 (1969).'" (quoting *First National Bank in Fort Collins v. Rostek*, 514 P.2d 314, 320 (Colo. 1973)).  I also note that although Grynberg may have suffered some indirect injury as the president of one of the companies that owns Cotundo, and RSM may have suffered some injury as one of the companies that owns Cotundo, the plaintiff who suffered the direct injury for Defendants' alleged unlawful activity is Cotundo, an Ecuadorian company.  Colorado has no interest in providing a forum for Cotundo to seek redress for its injuries.  However, given Grynberg's domicile and RSM's maintenance of an office in Colorado, I conclude that Colorado has small interest in providing a forum even though the injury actually suffered occurred in Ecuador and the Colorado residents only suffered indirect economic injury.  Therefore, this factor weighs slightly in favor of jurisdiction.

iii.     Plaintiff's interest in convenient and effective relief

This factor

> hinges on whether Plaintiff may receive convenient and effective relief in another forum.  This factor may weigh heavily where a Plaintiff's chances of recovery will be greatly diminished by forcing him to litigate in a [sic] another forum because of that forum's laws or because the burden may be so overwhelming as to practically foreclose pursuit of the lawsuit.

*OMI Holdings*, 149 F.3d at 1097.  Although Plaintiffs allege that their choice of forum should be deferred to, they have failed to indicate any reason why litigation in another forum is "so overwhelming as to practically foreclose pursuit of the lawsuit."  *Id.*  I also note that Defendants and many of the Plaintiffs themselves are not located in Colorado and there is no evidence that the laws of another forum will prevent Plaintiffs from pursuing their litigation.  Therefore, this factor weighs against finding jurisdiction.

iv.     Interstate judicial system's interest in obtaining efficient resolution

The fourth factor in the reasonableness inquiry asks "whether the forum state is the most efficient place to litigate the dispute." *OMI Holdings*, 149 F.3d at 1097.  This inquiry takes into consideration the location of relevant witnesses, where the alleged wrong occurred, what forum's substantive law governs the dispute, and "whether jurisdiction is necessary to prevent piecemeal litigation."  *Id.*  Since there is no personal jurisdiction over four of the five remaining Defendants, piecemeal litigation in multiple fora would result if I exercised jurisdiction over Friedland alone.  Moreover, Plaintiffs acknowledge that the Defendants' witnesses are not located in Colorado, but argue that Colorado is a "central location for all parties and witnesses to travel to."  (Resp., Docket No. 38 at 15.)  I, however, agree with Defendants there are no witnesses in Colorado besides Grynberg himself, that the case centers around the parties' rights in Ecuador, and that it is unlikely that the case will implicate Colorado law.  Therefore, this factor weighs against jurisdiction.

     v.     States' interest in furthering fundamental social policies

The fifth factor relates to "the interests of the several states, in addition to the forum state, in advancing fundamental substantive social policies." *OMI Holdings*, 149 F.3d at 1097.  Specifically, the factor asks "whether the exercise of personal jurisdiction by [Colorado] affects the substantive social policy interests of other states or foreign nations."  *Id.*  This factor weighs against jurisdiction as the claim alleges corruption in the Ecuadorian government and surrounds Ecuador's natural resource policies, claims and issues that Ecuador certain has an interest in adjudicating.  Therefore, this factor also weighs against asserting jurisdiction.

Plaintiffs' showing of minimum contacts with respect to Friedland is minimal at

best and this second prong would, therefore, need to weigh very strongly in favor of

asserting jurisdiction to justify jurisdiction in this Court.  Here, however, the

reasonableness factors weigh against asserting jurisdiction and demonstrate that

asserting personal jurisdiction over Friedland, as well as the other Defendants, would

offend "traditional notions of fair play and substantial justice."  *Int'l Shoe*, 326 U.S. at

316 (quoting *Milliken*, 311 U.S. at 463).  Thus, personal jurisdiction over Defendants is

not proper.[10]  *See  OMI Holdings*, 149 F.3d at 1091.

3.    Plaintiffs' Motion to Transfer (Docket No. 96)

Plaintiffs move for transfer of this case to California pursuant to 28 U.S.C. § 1631

if I determine that this Court lacks personal jurisdiction over Defendants.  Section 1631

provides

> Whenever a civil action is filed in a court . . .and that court finds that there is
> a want of jurisdiction, the court shall, if it is in the interest of justice, transfer
> such action or appeal to any other such court in which the action or appeal
> could have been brought at the time it was filed or noticed, and the action or
> appeal shall proceed as if it had been filed in or noticed for the court to which
> it is transferred on the date upon which it was actually filed in or noticed for
> the court from which it is transferred.

28 U.S.C. § 1631.  Under the statute, I have "considerable discretion in deciding

whether a § 1631 transfer would be appropriate."  *United States v. Botefuhr*, 309 F.3d

1263, 1274 n.8 (10th Cir. 2002) (citing *Phillips v. Seiter*, 173 F.3d 609, 610 (7th Cir.

1999)).  Factors that I must consider in determining a motion to transfer are (1) whether

the new action would be time-barred; (2) whether the claims are likely to have merit;

and (3) whether the original action was filed in good faith rather than filed "after 'plaintiff

---

[10]   Because I have concluded that Plaintiffs have not demonstrated any
independent basis for asserting personal jurisdiction over any individual defendant, I
need not address Plaintiffs' theories of alter ego, agency, or conspiracy.

either realized or should have realized that the forum in which he or she filed was improper.'" *Trujillo v. Williams*, 465 F.3d 1210, 1223 n.16 (10th Cir. 2006) (citations omitted).

First, I note that there is considerable dispute regarding whether the California court would have jurisdiction over all of the Defendants.  I am hesitant to transfer the case to a court where the question of jurisdiction is not clearly established.  Moreover, consideration of the *Trujillo* factors results in my determination that a transfer is not appropriate in this case.  I note that the parties agree that Plaintiffs action would not be time barred if filed in another district.  (*See* Mtn. Transfer, Docket No. 96 ¶ 13; Resp., Docket No. 104 at 7.)  In addition, a review of the complaint does not convince me that the claims likely have merit.  I note that many of the allegations made in the complaint regarding unlawful activity by Defendants with respect to their acquisition of the Pungarayacu Field concessions are made "upon information and belief."  (*See* Am. Compl. ¶¶ 37, 38, 45.)  Such conclusory allegations are not entitled to the assumption of truth.  *See Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009) (addressing the pleading requirements to survive a motion to dismiss).  Furthermore, with respect to their intentional interference and RICO claims, Plaintiffs have presented no evidence or specifics beyond conclusory allegations linking the cancellation of their Pungarayacu Field concessions to unlawful actions by Defendants.  With respect to the fraud and unjust enrichment claims, Plaintiffs present no more than a single reference to an estimate of the amount of oil in the Pungarayacu Field to demonstrate that Defendants misappropriated the confidential material sent to Defendants.  As this allegation does "not permit [me] to infer more than the mere possibility of misconduct, the complaint has

31

alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'"   *See id.*

Therefore, although I make no determination of whether Plaintiffs claims actually do

have merit, I cannot say, for purposes of deciding whether transfer is appropriate, that

Plaintiffs claims as set forth in the Amended Complaint are "likely to have merit."   *See*

*Trujillo*, 465 F.3d at 1223 n.16; *accord Haugh v. Booker*, 210 F.3d 1147, 1150 (10th Cir.

2000).

With respect to the third *Trujillo* factor, I conclude that there is at least some

argument that this case was filed in Colorado even though Plaintiffs should have known

that jurisdiction was not proper.  Indeed, Defendants do not conduct business or reside

in Colorado, the allegations of the complaint surround issues in Ecuador and not

Colorado, the direct injury occurred against an Ecuadorian company, Cotundo, and the

individual Defendants had limited contact with Colorado or the Plaintiffs in Colorado.

However, as these issues were at least somewhat difficult to resolve, as evidenced by

this Order, I conclude that this factor neither weighs in favor nor against transfer of the

case.

Finally, I note that, although not an express factor to consider under *Trujillo*, 465

F.3d at 1223 n.16, the interests of judicial economy do not weigh in favor of transfer.

This case has not progressed beyond the issue of personal jurisdiction in Colorado and,

therefore, little pleading and no discovery will need to be repeated should Plaintiffs refile

in California.  In light of all of these factors, I conclude that the "interests of justice" do

not weigh towards a transfer of this case to the Eastern District of California.

4.    Remaining Motions

As I have determined that this Court does not have general jurisdiction over

32

Friedland, Plaintiffs' Motion for Partial Summary Judgment on the General Personal

Jurisdiction of Defendant Friedland is now irrelevant and shall be denied as moot.  I

note further that this summary judgment motion was arguably redundant of the issues

addressed by the briefing for Defendants' motion to dismiss and, therefore, in violation

of D.C.COLO.LCivR 7.1H.  In fact, Plaintiffs themselves recognized the extensive and

complete briefing on the jurisdictional issues, including general jurisdiction over

Friedland, in the Motion for Partial Summary Judgment itself:

> So far, the jurisdictional pleadings in this case have progressed through
> hundreds of pages of materials outside the pleadings over several months
> . . . To say that the issues could be considered as fully briefed on summary
> judgment is an understatement . . . . [T]he case for general personal
> jurisdiction over Friedland has now been fully argued and proved, and no
> disputed material questions of fact on these issues remain.

(Mtn. Partial Summ. J., Docket No. 83 ¶ 1–2.)   Additionally, Magistrate Judge Boland

expressly noted the redundant and harassing nature of the motion when he granted

Defendants' motion to stay the briefing.  (Apr. 20, 2009 Hearing Tr., Docket No. 98 at

13.)[11]  Finally, I note that a motion for summary judgment motion is arguably not the

---

[11]   During the hearing on April 20, 2009, Magistrate Judge Boland asked
Plaintiff's counsel:

> If the issue of the jurisdiction over Mr. Friedland has been raised months ago
> in a motion and been briefed with hundreds of pages of briefing and exhibits,
> then why isn't it harassing to raise exactly that issue again with the
> concomitant obligation on the part of the defendants to brief it again? That
> sounds like harassment to me.

(Apr. 20, 2009 Hearing Tr., Docket No. 98 at 8:6–11.) Furthermore, at the conclusion of
the hearing, in granting Defendants' motion to stay, Magistrate Judge Boland stated:

> Well, because I don't perceive that proceeding in summary judgment adds
> anything to what the district judge could consider on a motion to dismiss,
> and because Mr. Jatko has not been able to provide me with anything which
> persuades me that there is some important addition by the filing of a motion

proper vehicle to determine jurisdictional issues.  *See Goff v. Hackett Stone Co.*, 185 F.3d 874, 1999 WL 397409, at *2 (10th Cir. 1999) (unpublished)[12] (concluding that the district court should have dismissed the case without prejudice under Rule 12(b) rather than granting summary judgment to defendants because the dismissal was based on lack of personal jurisdiction and improper venue); 4C Wright, Miller & Kane, Federal Practice & Procedure: Civ.3d § 2713 (2009); *see also Moody v. United States*, 202 F.3d 282, 1999 WL 1127634, at *3 (10th Cir. 1999) (unpublished) ("While we are in accord with the district court's result, we nevertheless believe an order of dismissal 'without prejudice' due to lack of [subject matter] jurisdiction is necessary in this case, rather than a summary judgment decision." (citing *id.*)).  Given my denial of this motion, Defendants' Motion to Strike Plaintiffs' Motion for Partial Summary Judgment (Docket No. 88) is now moot and shall be denied as such.

Accordingly, it is ordered:

1.    Plaintiffs' Appeal of Magistrate Judge Ruling (Docket No. 87) is denied.

---

for summary judgment which is not possible by deciding the current motion to dismiss with or without supplemental briefing, I'm going to grant the motion to stay briefing on the motion for partial summary judgment finding that the matter –- that the issues are fully raised in the pending motions, that any additional legal or factual arguments which must be made could be made in connection with that, those pending motions to dismiss, and that if leave to file supplemental briefs are necessary in order to bring something new to the attention of the district judge as he considers the motions to dismiss based on jurisdiction I'll hear those motions for supplemental briefing. But to add the new motion for summary judgment serves no purpose in my view and I will grant the motion to stay briefing.

(Apr. 20, 2009 Hearing Tr., Docket No. 98 at 13:3–22)

[12]   Although the Tenth Circuit does not allow citation to unpublished opinions for precedential value, unpublished opinions may be cited for persuasive value. 10th Cir. R. 32.1.

2.      The parties' Joint Motion to Clarify Applicability of Motion to Dismiss Operative

Complaint (Docket No. 52) is granted.

3.      The First Amended Complaint (Docket No. 40) is accepted as filed and deemed

the current operative complaint.

4.      Defendants' Amended Motion to Dismiss for Lack of Personal Jurisdiction

(Docket No. 18) is granted.

5.      Plaintiffs' Motion for Partial Summary Judgment on the General Personal

Jurisdiction of Defendant Friedland (Docket No. 83) is denied.

6.      Defendants' Motion to Strike Plaintiffs' Motion for Partial Summary Judgment

(Docket No. 88) is denied as moot.

7.      Plaintiffs' Motion to Transfer (Docket No. 96) is denied.

8.      This case is dismissed without prejudice.

9.      Defendants may have their costs.

DATED at Denver, Colorado, on January 28, 2010

BY THE COURT:


s/ Walker D. Miller
United States Senior District Judge